## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**GPS DISTRIBUTOR, INC.**,

    Plaintiff

    v.                              Civil No. 14-1667 (JAG/BJM)

**POWERMAX BATTERY (U.S.A.) INC.**,

    Defendant.

## REPORT AND RECOMMENDATION

GPS Distributor, Inc. ("GPS") brought this action against Powermax Battery (U.S.A.) Inc. ("Powermax") under the court's diversity jurisdiction, alleging that Powermax breached a contract, supplied defective batteries, and violated Puerto Rico Law 75 ("Law 75"), P.R. Laws Ann. tit. 10, §§ 278–278e, and Puerto Rico Law 21 ("Law 21"). *Id.* §§ 279–279h; Am. Compl., Docket No. 4. Powermax moved for summary judgment on the claims in GPS's amended complaint, Docket Nos. 42, 43-1, 54-1, and GPS opposed. Docket Nos. 51, 62. This matter was referred to me for a report and recommendation.[1] Docket No. 81.

For the reasons set forth below, Powermax's motion should be **GRANTED IN PART AND DENIED IN PART.**

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving

---

[1] Pending before the court, and not addressed here, is GPS's motion for summary judgment on Powermax's counterclaim. Docket Nos. 10, 91.

party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[2] submissions.[3]

---

[2] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the "district court may forgive a party's violation of a local rule," litigants ignore the Local Rule

Powermax is a California corporation that sells and supplies batteries, including Powermax-branded batteries, batteries branded with a private label (i.e., Wal-Mart's "Great Value"-branded batteries), and batteries labeled with the brands of other companies (i.e., ACDelco-branded batteries). Docket No. 42-4 at 1 ¶ 2. The president of Powermax is Neville Lin ("Lin"). *Id.* ¶ 3. In 2009, Powermax began doing business in Puerto Rico and accepted a proposal by Amaury Moreira ("Moreira"), a sales manager for Combine Sales Associates ("CSA"), to have Puerto Rico Beauty Supply, Inc. ("PRBS") distribute ACDelco-branded batteries in Puerto Rico. DSF ¶ 1. PRBS was a Puerto Rico corporation whose president was Carlos Martin-Celis ("Martin-Celis"). DSF ¶ 8. Martin-Celis's son, Carlos R. Martin Soegaard ("Martin"), was PRBS's vice president. DSF ¶ 8; Docket No. 42-3 at 65.

On February 10, 2010, Lin designated Evelio Moreira-Perez, doing business as CSA, as Powermax's exclusive representative in Puerto Rico and the U.S. Virgin Islands. DSF ¶ 5. CSA required Powermax's approval to appoint any distributors, and PRBS was a Powermax-approved distributor. DSF ¶ 5. On February 15, CSA designated PRBS as a distributor of ACDelco-branded batteries and flashlights. DSF ¶ 6. Per Lin's request, PRBS submitted a credit application to start doing business with Powermax. DSF ¶¶ 4, 10. The credit application was approved, and Powermax granted PRBS up to $150,000 of credit. Docket No. 42-9 at ¶ 5.

PRBS began ordering ACDelco batteries from Powermax without having had the terms of their agreement reduced to writing. *See* DSF ¶ 9; Docket No. 42-3 at 65. In June 2010, PRBS obtained from UBS Financial Services, Inc. ("UBS") a $300,000 letter of credit ("letter of credit") whose beneficiary was Powermax. Docket No. 42-5 at 12. In

---

"at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[3] Defendant's Statement of Facts ("DSF"), Docket No. 42-1; Plaintiff's Opposing Statement of Facts ("OSF"), Docket No. 52; Defendant's Reply Statement of Facts ("RSF"), Docket No. 55; and Plaintiff's Surreply Statement of Facts ("SSF"), Docket No. 63.

mid-August 2010, the letter of credit was increased to $500,000 and Powermax increased PRBS's credit limit to $200,000. Docket Nos. 42-3 at 64, 42-5 at 15. In late August 2010, Powermax's chief financial officer, Crystal Lin ("Crystal"), sent a letter to Moreira informing him that PRBS had exceeded its credit limit and that a payment of approximately $70,000 was required. Docket No. 42-3 at 64.

On September 1, 2010, Lin expressed to Martin that for eight months PRBS and Powermax had developed a "nice market share in Puerto Rico" for the sale of ACDelco batteries, and that PRBS's "great market penetration made th[e] program successful." Docket No. 42-3 at 65. But due to some "arguments" that had arisen between the parties, Lin decided to reduce their agreement to writing. *Id.* Among other things, the agreement required PRBS to pay a bill within 60 days of the invoice date. *Id.* at ¶ 3; DSF ¶ 11. Powermax also agreed to "repair or replace" defective products as long as their return was authorized. *Id.* ¶ 8. Two days later, Martin-Celis requested an increase of $300,000 to the credit limit applicable to PRBS's letter of credit, which was granted on September 15. Docket No. 42-5 at 17–18.

The business relationship for the distribution of ACDelco batteries in Puerto Rico continued, and PRBS ordered Powermax-branded batteries on one or two occasions. DSF ¶ 19. PRBS did not always pay its bills on time, prompting Powermax to send e-mails to Moreira requesting that PRBS pay amounts owed. DSF ¶ 31. Docket No. 42-7 at 20–23. Because PRBS did not pay its bills on time, Powermax resorted to collecting the amounts due from the letter of credit. DSF ¶ 32. At some point in 2011, PRBS stopped doing business with Powermax without giving Powermax advanced notice that it planned to do so. DSF ¶ 20. PRBS was dissolved on December 31, 2012. Docket No. 42-7 at 3.

"Beginning in 2012," Martin requested that Powermax bill GPS, a Puerto Rico corporation that distributes products, instead of PRBS. Docket No. 42-3 at 19; Docket No. 42-7 at 8, 10. GPS was incorporated by Vazquez Colon and Maria Del Pilar in June 2011, and Martin functioned as GPS's president. Docket No. 42-7 at 9–10; Docket No.

42-3 at 16. Powermax agreed to bill GPS instead of PRBS only if the obligor on the letter of credit was changed from PRBS to GPS. DSF ¶ 34. In late 2012, Powermax began billing GPS instead of PRBS. DSF ¶ 34. And in July 2013, with Powermax's authorization, UBS substituted GPS for PRBS as the obligor on the letter of credit. Docket No. 42-5 at 22–23. Powermax "never issued a formal agreement or appointment letter to substitute GPS for PRBS as the distributor of the AC Delco Brand," and Powermax asserts that these two companies are "separate corporate entities." DSF ¶ 21. GPS did not always pay its bills on time either, and Powermax resorted to collecting amounts owed by GPS from the letter of credit. DSF ¶ 35. In February 2014, Powermax collected around $300,000 from the letter of credit, leaving only approximately $115,000 of credit available. Docket No. 42-5 at 25. In April 2014, UBS decided that as of June 2014 it would no longer extend the letter of credit to GPS. *Id.* at 24.

### The Private Label Project

Wal-Mart Puerto Rico ("Wal-Mart-PR") was one of the stores that purchased Powermax-supplied batteries, and those purchases started sometime around August 2010. *See* Docket No. 42-3 at 64. Wal-Mart-PR purchased ACDelco batteries that were distributed by Martin's company (it is unclear whether that company was PRBS or GPS) until sometime in 2012. Docket No. 42-5 at 45. After Wal-Mart-PR stopped purchasing ACDelco batteries, a project was created to convince Wal-Mart-PR to sell batteries with its private label: the "Great Value" batteries. Docket No. 42-5 at 45. The parties refer to this project as the private label project (the "Project").

The record is mired with conflicting accounts of the extent to which GPS was responsible for the Project, and of the relationship the parties would have once the Project was accepted by Wal-Mart-PR. The first dispute relates to the persons responsible for trailblazing the path for the Project. According to Powermax, it began presenting the private label concept to Wal-Mart-PR's parent corporation in 2007 and Moreira proposed the Project to Martin. DSF ¶ 50; Docket No. 42-5 at 45. GPS disputes this, as Martin

testified that he first proposed the Project in 2010 and that nobody had suggested that idea to him. Docket No. 52-2 at 19–20.

The parties also dispute the extent of involvement GPS had in developing the Project. According to Martin's testimony, GPS "made a market analysis," did an "exhaustive study," and "did everything that needed to be done to prepare the product for a private label," including, among other things, the "labels, the execution, [and] the sales." Docket No. 51-5 at 4. According to Martin, he also made several presentations to Wal-Mart-PR to get the company on board with the Project. *Id.* at 81. Martin also testified that CSA's Moreira was "never" involved in developing the marketing for the Project, and that Moreira "played no role" in the development of the Project plan. *Id.* at 80.

Powermax tells a somewhat different story, saying that Powermax and Moreira developed the Project and GPS had a "limited role in the logistics" of the Project. DSF ¶¶ 64, 65. In support of this account, Powermax highlights that its employee, Keia Payne ("Payne"), was the person primarily responsible for developing the designs for the Great Value batteries. DSF ¶ 53. Powermax acknowledges, however, that Martin approached Wal-Mart-PR to collect information that was sent to Moreira and Powermax's team, including Payne. DSF ¶¶ 52, 53. And Powermax also acknowledges that Martin was asked to get Wal-Mart-PR's approval for the Project. DSF ¶ 54.

On August 3, 2012, Powermax secured a Supplier Agreement ("Supplier Agreement") with Wal-Mart-PR to supply Great Value-branded batteries, which were produced in China and transported to Puerto Rico at Powermax's expense. DSF ¶ 40; Docket No. 42-5 at 26. On that same date, Lin sent an e-mail to Moreira and Martin in which he informed them that they were "set up with Wal-Mart," thanked them for their help, and forwarded an e-mail pertaining to the Supplier Agreement. Docket No. 42-5 at 58. The parties quarrel over the agreement that would govern their relationship after Wal-Mart-PR accepted the Project. The record has at least three documents that could supply

the terms applicable to the parties' business agreement: (1) a September 2010 agreement between PRBS and Powermax for the delivery of ACDelco batteries; (2) a three-year "Private Label Agreement" ("Private Label Agreement") from 2012 between PRBS and Powermax for the purchase of Great Value batteries; and (3) a 2013 Service Agreement ("Service Agreement") between GPS and Powermax for the storage and delivery of Great Value batteries. Ex. 45, Docket No. 42-8 at 31–36.

While Powermax represents that GPS and Powermax had a Service Agreement that related to the delivery of Great Value batteries to Wal-Mart-PR, DSF ¶ 57; Ex. 45, Docket No. 42-8 at 30–31, GPS denies that the parties had such an agreement and challenges the authenticity of the unsigned document that Powermax submitted, which bears the year "2013" at the bottom of the document but is otherwise undated. Docket No. 42-8 at 30–31. In response to the authenticity challenge, Powermax cites Local Rule 56 and cryptically states that "GPS offers no evidence in opposition to rebut the fact that the" Project was meant to be "akin to a servicing agreement" and that the terms of "such agreement were included in the document." [4] Docket No. 55 at 13. And while counsel for Powermax asserts that it was common practice for Lin to send electronic documents without having them signed and that Lin was available to authenticate certain documents, Powermax's counsel did not represent that Lin or anyone else could authenticate the Service Agreement and, ultimately, no effort was made to authenticate the document. Docket No. 55 at 12–13.

Moreover, while Martin testified that Powermax and GPS had reached an agreement for the purchase of Great Value batteries, it is unclear whether the Private

---

[4] To the extent Powermax contends that Local Rule 56 allows the court to accept its statement of fact despite GPS's objection and merely because GPS has not proffered evidence to the contrary, that contention is misplaced. *See* Docket No. 55 at 13. Federal Rule of Civil Procedure 56 permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Consistent with this Rule, Local Rule 56 permits the court to disregard any statement of fact supported by "record material" that is not "properly considered on summary judgment." D.P.R. Civ. R. 56(e).

Label Agreement is the agreement to which he was referring and whether this agreement was supposed to bind GPS and Powermax once Wal-Mart-PR accepted the Project. Docket No. 52-2 at 23–24. In this vein, Martin also testified that the Project actually belonged to GPS and that GPS's vendor number was used when the Project was first implemented. *Id.* at 24.

Wal-Mart-PR began placing orders for the Great Value batteries. DSF ¶ 69. The Supplier Agreement between Wal-Mart-PR listed Martin as the person to contact for the account, and GPS was responsible for storing the shipment of batteries in its warehouse and delivering those batteries to Wal-Mart-PR. DSF ¶ 57; Docket No. 42-5 at 26. For the orders placed from May to July 2013, GPS was not required to purchase the Great Value batteries before delivering them to Wal-Mart-PR. DSF ¶ 73; OSF ¶ 73. And per the Supplier Agreement, Wal-Mart-PR placed its orders directly with Powermax, Powermax shipped the batteries to Puerto Rico, and Powermax was responsible for billing Wal-Mart-PR. Docket No. 42-5 at 26. Martin testified that GPS's vendor number was initially used for the orders that Wal-Mart-PR placed, but at some point Powermax acquired its own vendor number and the orders were transferred to Powermax's vendor number. Docket No. 52-2 at 23–24

Once the containers of Great Value batteries arrived, Martin contacted Wal-Mart-PR and asked one of its employees to transfer the Great Value batteries to GPS's vendor number. DSF ¶¶ 70, 71. This arrangement allowed GPS to invoice Wal-Mart-PR for the Great Value batteries. DSF ¶ 74. While GPS did not purchase these batteries, Martin claims that he asked Wal-Mart-PR to use GPS's vendor number because Wal-Mart-PR initially did so when the Project was implemented and suggests that this arrangement was consistent with the agreement that Powermax and GPS had reached. Docket No. 52-2 at 23–2

On July 30, 2013, Lin sent Martin a letter in which he asserted that GPS had breached their business agreement, that Powermax had "decided to hold" all of GPS's

"PO/shipments" until they resolved the issue, and that GPS would be responsible for any associated costs. Docket No. 42-5 at 59. According to Lin's letter, GPS had breached their agreement because GPS had directly invoiced Wal-Mart-PR for the Great Value batteries as opposed to following the "normal procedure" whereby Powermax would authorize GPS to deliver the products after receiving an order from Wal-Mart-PR. *Id.* Believing that GPS had breached the parties' business agreement, Powermax paid to have containers of Great Value batteries sent to a third-party's warehouse rather than GPS's. DSF ¶ 76. The parties' falling-out prevented batteries from being delivered to Wal-Mart-PR.

Around August 2013, Wal-Mart-PR allegedly terminated the agreement for the Great Value batteries because its orders for those batteries were not being filled. Docket No. 4 at 14. GPS received its final deliveries of batteries from Powermax sometime in 2013. DSF ¶¶ 86, 87; Docket No. 52-5 at 3–4. In July and August 2013, GPS's representatives contacted Moreira at his Powermax-issued e-mail address to complain about the batteries received. Docket No. 62-5. GPS claims that it has sustained various damages, including inventory that cannot be sold. DSF ¶ 131; Docket No. 42-6 at 51. GPS commenced this action in September 2014 and amended its complaint in December 2014. Docket Nos. 1, 4.

## DISCUSSION

Powermax contends that it is entitled to summary judgment on all of the claims in GPS's amended complaint. Docket No. 42 at 1. GPS concedes that it is not entitled to relief under Law 21, but contends that summary judgment is improper as to its remaining claims because there are genuine disputes of material fact. Docket No. 51 at 15 ¶¶ D, E.

## I.      Law 75

Law 75 "protects dealers only" and was specifically enacted to "remedy the abusive practices of suppliers who arbitrarily eliminated distributors after they had invested in the business and had successfully established a market in Puerto Rico for the

supplier's product or service." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (internal citation and quotation marks omitted). This state-law provision provides "that, in a dealer's contract, 'no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.'" *Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490, 493 (1st Cir. 2016) (quoting P.R. Laws Ann. tit. 10, § 278a). The statute defines a "dealer" as a "[p]erson actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." P.R. Laws Ann. tit. 10, § 278(a). And a "dealer's contract" is defined as a "[r]elationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." *Id.* § 278(b).

There are "two essential elements" for a claim alleging an impermissible termination or impairment of a dealer's contract: (1) "that the contract existing between the parties was impaired or terminated without just cause" and (2) "that there were resulting damages." *Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 320 (1st Cir. 1999). "After the plaintiff has shown an impairment or termination of the contract, the defendant may offer the affirmative defense of just cause. If there was no just cause, the plaintiff must show damages." *Id.* The parties quarrel over the contractual relationship that existed between the parties, whether GPS was a dealer within the meaning of the statute, whether Powermax had just cause to terminate or impair the parties' relationship, and whether GPS has provided sufficient evidence of the resulting damages.

## A.    Dealer's Contract

Powermax asserts that it "never issued a formal agreement or appointment letter to substitute GPS for [PRBS] as the distributor of" ACDelco-branded batteries, that "GPS

was not a party to the Supplier Agreement" between Wal-Mart-PR and Powermax, and that GPS was bound by a Service Agreement between Powermax and GPS. Docket No. 43-1 at 7, 7 n.5, 12–13. GPS responds that it had an exclusive agreement with Powermax to deliver *all* of its products, including both the ACDelco and Great Value batteries. Docket No. 51 at 10. Neither Powermax's argument nor GPS's hits the mark, and this squabble drives many of the genuine disputes of material fact precluding summary judgment on the Law 75 claim.

As an initial matter, GPS may be protected under Law 75 even if the agreement it had with Powermax did not make GPS the exclusive distributor of *all* products supplied by Powermax. *Vulcan Tools of P.R. v. Makita U.S.A.*, Inc., 23 F.3d 564, 569 (1st Cir. 1994) ("It is beyond cavil that non-exclusive distributors are entitled to protection under Law 75"). This is not to say that Law 75 operates "to convert non-exclusive distribution contracts into exclusive distribution contracts"—it does not. *Id.* Rather, a key task imposed by the statute requires the court to ascertain the *established relationship* between the parties, regardless of "the manner in which the parties may call, characterize *or* execute such relationship." *See* P.R. Laws Ann. tit. 10, § 278(b) (emphasis added). And because a supplier's "disclaimer regarding the nature of the relationship between" the parties does not present a "legal obstacle to a finding that" a party "is entitled to the protective cloak of Law 75," the court need not give weight to the labels the parties have assigned for each other (i.e., Powermax's suggestion that GPS was not a duly approved Powermax distributor). *See Homedical Inc. v. Sarns/3M Health Care, Inc.*, 875 F. Supp. 947, 950 (D.P.R. 1995); P.R. Laws Ann. tit. 10, § 278(b).

To determine the parties' established relationship, examining a written agreement reached by the parties—if one is available—is a sensible place to start (and in some cases, to end) this inquiry. *See Triangle Trading Co.*, 200 F.3d at 5; *Vulcan Tools*, 23 F.3d at 569 ("the 'established relationship' between dealer and principal is bounded by the distribution agreement"). Powermax represents, and GPS adduces no evidence to the

contrary, that there is no formal written agreement substituting GPS for PRBS in the agreement for the distribution of the ACDelco batteries. And GPS is not a party to the Supplier Agreement between Powermax and Wal-Mart-PR. As to the distribution of Wal-Mart-PR's Great Value batteries, on the other hand, Powermax has submitted an unsigned, undated document that it suggests was the agreement that governed the parties' relationship after Wal-Mart-PR accepted the Project. Docket No. 43-1 at 13. But because Powermax has not authenticated the document at this juncture, it may not be considered to resolve the motion before the court.[5] *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (documents "supporting or opposing summary judgment must be properly authenticated," and "failure to authenticate precludes consideration of" those documents). And counsel's representation that the document can be authenticated at trial is not enough. Docket No. 55 at 12–13; *see, e.g.*, *Setterlund v. Potter*, 597 F. Supp. 2d 167, 171 (D. Mass. 2008) ("the appearance of authenticity" and counsel's assertion in a summary judgment motion "that the documents are authentic" are insufficient to establish the authenticity of a document) (citing *Transurface Carriers, Inc. v. Ford Motor Co.*, 738 F.2d 42, 46 (1st Cir. 1984)).

In light of the above, neither Powermax nor GPS has presented admissible evidence of a written agreement between the parties that relates to the distribution of Great Value batteries.[6] But the absence of any formal written agreement is not fatal to the Law 75 claim, for a relationship deserving the statute's protection need not be

---

[5] This may be an entirely different case if and when Powermax authenticates the Service Agreement and shows that it was the binding agreement between the parties. *See Vulcan Tools*, 23 F.3d at 567, 569 ("the 'established relationship' between dealer and principal is bounded by the distribution agreement," and a party generally may not introduce oral testimony to stray from the clear terms of a binding agreement between the parties). But unless and until that happens, I am precluded from considering the document and must assume the document was not the binding agreement between the parties.

[6] A contract between GPS and Powermax would be "a commercial contract" and would therefore be "regulated by the relevant provisions of the Commerce Code of Puerto Rico." *See Vulcan Tools*, 23 F.3d at 567 (citing P.R. Laws Ann. tit. 10, §§ 1301–1314).

"committed to writing." *R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 483 (1st Cir. 1994); *see also Madelux Int'l, Inc. v. Barama Co.*, 364 F. Supp. 2d 68, 74 (D.P.R. 2005) (formal written agreement unnecessary), *aff'd*, 186 F. App'x 10, 11 (1st Cir. 2006) ("district court . . . correctly understood the applicable law"). In *Welch*, for example, a supplier-dealer relationship was found where the parties had not reduced their agreement to writing but had been "operating as business partners under *some* terms for a full year." *Id.* (emphasis in original); *see also Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 871 (1st Cir. 1998) ("direct business relations as in *Welch* can provide evidence of a dealer relationship").

In this case, the record evidence, when read in the light most favorable to GPS, reveals that GPS and Powermax were operating as business partners for at least one year. GPS was incorporated in June 2011, and Powermax acknowledges that it stopped doing business with PRBS sometime in 2011. And beginning in 2012, Martin asked Powermax to start billing GPS instead of PRBS. Additionally, there is an e-mail from August 2012 that demonstrates Powermax had been doing business with GPS for some time before that month. Docket No. 42-7 at 24. What is more, Powermax at the very least acknowledges that the contract for Great Value batteries was signed in August 2012 and that it agreed to start billing GPS in late 2012. Because a reasonable jury could find that Powermax and GPS were operating as business partners under *some* terms for at least one year, a reasonable jury could also find that GPS had an interest in a dealer's contract. *See R.W. Int'l Corp.*, 13 F.3d at 483.

To be sure, in support of their respective positions, Powermax and GPS each rely on, and distance themselves from, the contracts created between PRBS and Powermax. In this regard, it bears noting that "[t]he properties of two corporations are distinct though the same shareholders own or control both." *Unilever Home & Pers. Care USA v. Puerto Rico Beauty Supply, Inc.*, 162 F. App'x 22, 25 (1st Cir. 2006) (quoting 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 31 (rev. ed. 1999)). And while Puerto

GPS Distributor, Inc. v. Powermax Battery (U.S.A.) Inc., Civil No. 14-1667 (JAG/BJM)          14

Rico law recognizes an assignment of a contract, which is "the transfer by one of the
contracting parties to a third party[] of the exact and integral position occupied by the
former in the assigned contract," the contract must be effectively assigned. *Goya de P.R.
v. Rowland Coffee Roasters, Inc.*, 206 F. Supp. 2d 211, 218 (D.P.R. 2002). "For an
effective assignment to occur, 'the three interested parties must concur in the act of the
assignment: the party that transfers its position in the contract (the assignor), the assignee
party that will acquire it and the obligor that will be affected by the change of the person
with whom he had contracted.'" *Puerto Rico Beauty Supply, Inc.*, 162 F. App'x at 26
(quoting *Goya de P.R.*, 206 F. Supp. 2d at 218).

In *Puerto Rico Beauty Supply, Inc.*, the First Circuit held that the lower court
should not have found that PRBS "was or became a party to" a distributorship agreement
belonging to Llorens Caribbean Distribution Company ("Llorens Caribbean"). *Puerto
Rico Beauty Supply, Inc.*, 162 F. App'x at 25. The First Circuit reasoned that while PRBS
was a subsidiary of Llorens Caribbean, the two corporations were distinct entities and
there was a genuine dispute of material fact as to whether the distributorship agreement
was validly assigned from Llorens Caribbean to PRBS. *Id.* at 25–26. In light of the
conflicting record evidence, the First Circuit reasoned that it could have been possible
that PRBS entered into a new agreement with the defendant-supplier as opposed to being
bound by the agreement subscribed by Llorens Caribbean. *Id.* at 26–27. Instead of
resolving the dispute on summary judgment, the First Circuit held that the "factfinder"
was required to "sort this out." *Id.* at 27.

In this case, Lin stated in his affidavit that "in July 2012" Powermax "agreed to
do business with GPS" after GPS claimed to be the "new distributor by virtue of an
*alleged assignment of the contract*." Docket No. 42-4 at 3 ¶ 11 (emphasis added). It is
unclear, however, whether *PRBS* effectively assigned its contracts to GPS such that the
latter would be bound by, and be able to benefit from, any agreements created between
PRBS and Powermax—particularly because PRBS was not dissolved until December

2012 and the two corporations spearheaded by Martin coexisted for over a year. *See Puerto Rico Beauty Supply, Inc.*, 162 F. App'x at 26. These circumstances also implicate GPS's claim that it is PRBS's "successor." Adding to the uncertainty of the relationship between the parties after PRBS disappeared or lurked in the shadows is Lin's statement that GPS and Powermax's agreement was "partly written, partly oral, and partly implied-in-fact." Docket No. 42-4 at 3 ¶ 11.

These issues——which have not received meaningful briefing from parties— animate some of the genuine disputes of material fact. For example, Martin testified that GPS had an agreement with Powermax to purchase Great Value batteries, presumably to distribute them to Wal-Mart-PR and bill accordingly. Docket No. 52-2 at 23–24. There is a document in the record (i.e., the Private Label Agreement, which remains to be authenticated) that appears to be a three-year contract between Powermax and *PRBS* for the purchase of Great Value batteries. Ex. 45, Docket No. 42-8 at 34–35. Objecting to GPS's ability to benefit from PRBS's contracts, Powermax suggests at one point in its brief that GPS cannot benefit "from all agreements reached with PRBS." Docket No. 43-1 at 7 n.5. At other points, however, Powermax argues that GPS is responsible for the terms included in PRBS's contracts because GPS is PRBS's successor. Docket No. 54-1 at 2. For example, Powermax contends that GPS should be held accountable to the payment terms (i.e., payment within 60 days of the invoice date) that were included in the agreements between PRBS and Powermax, as well as PRBS's history of late payments— which GPS resists. Docket No. 54-1 at 2. These disputes, which go to the heart of the parties' respective positions, preclude summary judgment at this juncture and may require a "factfinder" to sort out the precise contracts that governed the relationship between GPS and Powermax. *See Puerto Rico Beauty Supply, Inc*., 162 F. App'x at 25–26.

### B.    Dealer

Powermax contends that GPS was not a "dealer" within the meaning of Law 75. To determine if a person qualifies as a dealer, the "core question" is whether that person

"obtained a certain level of control over the distribution of the supplier's products in Puerto Rico." *Triangle Trading Co.*, 200 F.3d at 4. And to answer that core question, the following criteria are considered: (1) promotion of the product, (2) keeping an inventory, (3) fixing prices, (4) delivery and billing responsibilities, (5) authority to extend credit, (6) advertising campaigns, (7) assumption of risk, (8) purchasing the product, (9) maintaining facilities, and (10) offering product-related services to clients. *Triangle Trading Co.*, 200 F.3d at 4–5; *see also Jorge Rivera Surillo & Co. v. Cerro Copper Prods. Co.*, 885 F. Supp. 358, 361 (D.P.R. 1995) (Law 75 "does not define dealer in terms of the merchandise but in terms of the person's activities in relation to the merchandise or service").

When considering these criteria, "[n]o single factor is conclusive by itself and none has more weight or importance than the others." *Triangle Trading Co.*, 200 F.3d at 5 (quoting *Roberco, Inc. y Colon v. Oxford Inds., Inc.*, 122 D.P.R. 115, 132 (P.R. June 30, 1988)). And "[t]he absence of one or two or a few of the activities of a dealer is not sufficient grounds to sustain that the person is not a dealer." *A.M. Capens Co. v. Am. Trading & Prod. Corp.*, 892 F. Supp. 36, 40 (D.P.R. 1995), *aff'd sub nom. A.M. Capen's Co. v. Am. Trading & Prod. Corp.*, 74 F.3d 317 (1st Cir. 1996).

In this case, with respect to the Great Value batteries, it is undisputed that GPS did not fix prices or extend credit to Wal-Mart-PR. It is also undisputed that GPS was responsible for delivering the Great Value batteries to Wal-Mart-PR and that GPS maintained a warehouse where it stored those batteries. And a reasonable jury could also find that GPS could potentially be tasked with offering product-related services because Martin was listed as the "account contact" in the Supplier Agreement between Wal-Mart-PR and Powermax.

With respect to the promotion and initial marketing of the product, Powermax argues that it was primarily responsible for the Project. In support of this position, Powermax highlights that its employee, Payne, created the designs for the batteries and

that Moreira actively participated in developing the Project. On the other hand, Martin contends that he came up with the idea for the Project and that GPS did much of the initial heavy lifting by creating the market analysis for the Project and providing presentations to Wal-Mart-PR about the Project. GPS also claims that Moreira "never" participated in the market analysis and "played no role" in the development of the Project plan. These genuine disputes are not susceptible to summary judgment adjudication.

Moreover, while it is undisputed that GPS did not purchase the Great Value batteries that Powermax shipped from May to July 2013, there is a dispute as to whether GPS would purchase the batteries under the parties' agreement and assume the risk of selling them to Wal-Mart-PR. Martin testified that GPS reached an agreement with Powermax to sell the Great Value batteries. In support of this position, GPS appears to rely on Martin's testimony and an unsigned agreement (i.e., the Private Label Agreement) from 2012 between PRBS and Powermax for the purchase of Great Value batteries. Martin adds that orders were initially directed to GPS's vendor number. Disputing the foregoing, Powermax contends that under its agreement with Wal-Mart-PR, Powermax would directly bill Wal-Mart-PR for the Great Value batteries and GPS was not required to purchase the batteries before delivering them. These genuine disputes of material fact preclude summary judgment on this issue. Thus, Powermax failed to establish that no reasonable jury could find that GPS was a dealer within the meaning of Law 75.

**C.    Just Cause**

Powermax contends that (1) it did not terminate or impair the relationship with GPS because GPS "simply stopped placing orders," and (2) that even if Powermax did terminate or impair the relationship, it had just cause for doing so. Docket No. 43-1 at 3, 7. Powermax's first argument is easily dispatched. "Law 75 enumerates some instances of impairment by way of illustration and establishes a rebuttable presumption of impairment whenever a principal bypasses a dealer by distributing merchandise directly; appoints additional dealers in contravention of the agreement; *fails to adequately fill orders*; or

arbitrarily changes the transportation and/or payment terms." *Irvine*, 194 F.3d at 318 (emphasis added) (citing P.R. Laws Ann. tit. 10, § 278a-1(b)(1)–(4)). Because in July 2013 Powermax asserted that GPS had breached their business agreement and decided to "hold" all of GPS's shipments until the issue was resolved, a reasonable jury could at the very least find that Powermax impaired the parties' business relationship by representing that it would no longer fill GPS's orders.

Powermax's other argument is not susceptible to adjudication on summary judgment because it is muddled with genuine disputes of material fact. The "just cause" inquiry under Law 75 is typically a "question of fact," and so are "the subsidiary issues (i) whether the contracting parties considered the particular contract obligation allegedly breached by the dealer to be "essential," and "(ii) whether any other 'non-breaching' acts or omissions by the dealer were nonetheless sufficiently egregious to have 'adversely and substantially affect[ed] the interest of the principal or grantor in promoting the marketing or distribution of the merchandise or service." *R.W. Int'l Corp.*, 88 F.3d at 51–52. Once the dealer establishes that a relationship protected by Law 75 has been terminated or impaired, "the principal must carry the burden of persuasion on the factual elements of the 'just cause' showing." *Id.* at 52.

Powermax first argues that it terminated the relationship with GPS because of late payments. The First Circuit "has held that 'paying for goods on time *normally* is one of the essential obligations of the dealer's contract,' the non-fulfillment of which *can* constitute just cause under Law 75." *Waterproofing Sys., Inc. v. Hydro-Stop, Inc.*, 440 F.3d 24, 29 (1st Cir. 2006) (emphases added) (quoting *PPM Chemical Corp. of P.R. v. Saskatoon Chemical Ltd.*, 931 F.2d 138, 139 (1st Cir. 1991) (internal citation and quotation marks omitted)). But there is an exception to this rule in the "unusual cases where 'a supplier does not care about late payments.'" *Waterproofing Sys., Inc.*, 440 F.3d at 29 (quoting *Biomedical Instrument & Equip. Corp. v. Cordis Corp.*, 797 F.2d 16, 18 (1st Cir. 1986) (Breyer, J.)). In *Biomedical*, there was a genuine dispute of material fact

as to whether the supplier truly cared about late payments where there was evidence which suggested that the "decision to terminate had little to do with overdue balances," that late payments would not be a ground for terminating the relationship, and that there was a history of overdue balances. 797 F.2d at 17–18.

In this case, Powermax highlights that there were instances where GPS did not timely pay invoices, that Powermax sent e-mails requesting payments, and that Powermax resorted to collecting amounts owed from the letter of credit. These points certainly suggest that Powermax cared about being paid on time, that timely payments were an "essential" obligation, and that Powermax took steps to enforce collection of amounts owed. *See Waterproofing Sys., Inc.*, 440 F.3d at 29. But on the other hand, GPS underscores that Lin's July 2013 letter which terminated or impaired the parties' relationship makes no mention whatsoever of GPS's late payments. *See* Docket No. 42-5 at 59. GPS contends that the substance of the letter suggests that the "decision to terminate had little to do with overdue balances" and suggests that this ground is a post-hoc rationalization by Powermax's counsel to justify Powermax's actions. *See Biomedical*, 797 F.2d at 18.

Moreover, when read in the light most favorable to GPS, the record evidence reveals that the parties did business for over a year despite the balances owed and that Powermax would resort to collecting payments from the letter of credit—as opposed to terminating or impairing the parties' relationship—when it was necessary for Powermax to get paid. Powermax does not suggest the funds available in the letter of credit were depleted in July 2013, and a statement from UBS indicates that around $100,000 worth of credit remained available in February 2014. Because there is a genuine dispute of material fact as to whether Powermax terminated or impaired the parties' relationship due to late payments, summary judgment should not be granted on this ground.

Powermax next argues that the relationship was terminated because GPS committed a breach of trust. Under Law 75, a principal has just cause to terminate the

relationship if there is an act or omission on the part of the dealer that "adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." P.R. Laws Ann. tit. 10, § 278(d); *see also Waterproofing Sys., Inc.*, 440 F.3d at 29 (supplier asserted "two separate grounds to support its claim of just cause: Waterproofing's consistent failure to make timely payments, and the alleged fraud and breach of trust").

Powermax's theory is that GPS was resentful because of the Supplier Agreement reached between Powermax and Wal-Mart-PR and that GPS ate Powermax's lunch by convincing one of Wal-Mart-PR's employees to place orders for the Great Value batteries using GPS's vendor number. This action breached any trust Powermax could have in the parties' business relationship—Powermax contends—because it allowed GPS to convert Powermax's property and to bill Wal-Mart-PR without having incurred the cost of shipping the Great Value batteries from China. Some evidence supports this theory.

Disputing this characterization, GPS seeks to tell a different story: that GPS and Powermax reached an agreement for the purchase of Great Value batteries; that Powermax bamboozled GPS out of the Supplier Agreement; and that GPS asked a Wal-Mart-PR employee to use GPS's vendor number, as was initially done, so that the parties' relationship would be in accord with their agreements. Some evidence supports this theory, too. Because the dispute between the parties turns on their established relationship with respect to the Great Value batteries, because no admissible evidence of a written agreement between the parties has been adduced at this stage, and because the parties have adduced conflicting testimonies as to the contours of their business agreement, a genuine dispute of material fact precludes summary judgment on this issue.

### D.    Damages

Powermax contends that GPS has failed to establish that it suffered damages. "Law 75 establishes a formula for the indemnification of dealers/distributors in the event of either termination or impairment to the relationship by a principal without just cause."

*Irvine*, 194 F.3d at 319. Damages are not "automatically conferred in all cases of termination and/or impairment," and "evidence of damages is an essential element of a Law 75 violation as to which plaintiff bears the burden of proof." *Id.* Section 278b provides "guidelines to be utilized contingent upon the presentation of adequate proof in each case." *Irvine*, 194 F.3d at 320. Under section 278b, evidence showing "the cost of the goods, parts, pieces, accessories and utensils that the dealer may have in stock, and from whose sale or exploitation he is unable to benefit," among other things, is sufficient to establish that the dealer has suffered resulting damages. P.R. Laws Ann. tit. 10, § 278b.

GPS claims various damages, including the cost of the inventory that could not be sold after the parties' dispute. While Powermax disputes the *extent* of the alleged damages suffered by challenging the conclusions reached by GPS's proposed expert witness, Powermax does acknowledge that there is at least a "little" admissible evidence of GPS's damages. Docket No. 43-1 at 26 ("GPS and its expert have brought forth little to no admissible evidence in support of GPS's claim for damages"). For example, while GPS claims that it has suffered damages of over $700,000 due to Powermax-supplied batteries that it cannot sell as a result of the parties' dispute, Powermax asserts that the figure must be lower because GPS's total inventory was only valued at around $300,000. Docket No. 43-1 at 42–43.

While Powermax disputed the *amount* of inventory that GPS claims it cannot sell, it did not contest GPS's claim that it is unable to benefit from the "sale or exploitation" of those batteries as a result of the parties' dispute. *See* P.R. Laws Ann. tit. 10, § 278b; *see* Docket No. 43-1 at 42–43. This being the case, while there is a genuine dispute of material fact as to the precise amount of damages to which GPS is entitled, GPS has met its burden on summary judgment of showing *some* damages. The task of deciding whether GPS is entitled to the full extent of its claimed damages (assuming adequate proof is provided—which Powermax may challenge in, for example, a motion in limine) is a question for a jury. *See, e.g.*, *Davignon v. Clemmey*, 322 F.3d 1, 11 (1st Cir. 2003) (in

GPS Distributor, Inc. v. Powermax Battery (U.S.A.) Inc., Civil No. 14-1667 (JAG/BJM)                    22

federal court cases brought under the court's diversity jurisdiction, "[t]he task of estimating money damages . . . constitutes a core jury function"). In sum, because the Law 75 claim is riddled with genuine disputes of material fact, the court should deny summary judgment on this claim.

## II.      Breach of Contract

GPS's amended complaint asserts a cause of action for breach of contract. Am. Compl. at 17–18. While Powermax moved to dismiss all the claims in GPS's amended complaint, it did not specify the reasons, either factual or legal, that it is entitled to summary judgment on the breach-of-contract claim. *See Lopez v. Corporacion Azucarera de P.R.*, 938 F.2d 1510, 1516 (1st Cir. 1991) ("The moving party invariably bears both the initial and the ultimate burden of demonstrating its legal entitlement to summary judgment."). Powermax's failure to do so should result in allowing the breach-of-contract claim to survive summary judgment. *See Leyva v. On The Beach, Inc.*, 171 F.3d 717, 719 (1st Cir. 1999) ("unbesought summary judgments can prove problematic in the absence of proper procedural protections," and while the district court has the authority to enter summary judgment sua sponte, the First Circuit has "counseled caution in the use of that technique" and has imposed "two constraints" on the trial court). Moreover, because there are genuine disputes of material fact as to which contract governed the business relationship between GPS and Powermax, this is an additional reason for allowing the breach-of-contract claim to remain. Thus, the court should deny summary judgment on GPS's breach-of-contract claim. [7]

---

[7] In this vein, I note that Powermax has filed a counterclaim that alleges a breach of contract by GPS. Docket No. 10. GPS has moved for summary judgment on Powermax's counterclaim. Docket Nos. 91. That there is a live dispute over the party responsible for breaching a contract governing the business relationship between Powermax and GPS is an additional reason for not entering summary judgment in Powermax's favor on the breach-of-contract claim at this time.

### III.    Defective Batteries

Powermax contends that GPS's claim for defective and expired batteries is time-barred by the limitations period imposed by the Puerto Rico Commerce Code. "Chapter 51 of the Commerce Code provides that the Code applies to all commercial transactions, regardless of whether they are consummated by merchants." *Jorge Rivera Surillo & Co. v. Falconer Glass Indus., Inc.*, 37 F.3d 25, 27 (1st Cir. 1994) (*Falconer Glass*). The Commerce Code specifies that "[a] purchase and sale of personal property for the purpose of resale, either in the form purchased or in a different form, for the purpose of deriving profit in the resale, shall be considered commercial." P.R. Laws Ann. tit. 10, § 243. Because it is undisputed that GPS ordered batteries from Powermax to resell them in the Puerto Rico market, its dealings with Powermax were commercial transactions governed by the Commerce Code. *See id.*

Section 260 of the Commerce Code provides that "[a] purchaser who has not made any claim based on the inherent defects in the article sold, within the thirty days following its delivery, shall lose all rights of action against the vendor for such defects." P.R. Laws Ann. tit. 10, § 1718. The Commerce Code's use of the phrase "inherent defect" refers to a "hidden defect." *See Falconer Glass*, 37 F.3d at 28. The limitations period imposed by Section 260 "is fatal and starts to run regardless of when the defect is discovered by the purchaser." *Torres-Mas v. Carver Boat Corp.*, 233 F. Supp. 2d 253, 257 (D.P.R. 2002). If a purchaser gives timely notice to the supplier, "the statute of limitations to initiate suit for hidden defects is six . . . months from the date of delivery."

In this case, it is undisputed that the final delivery of batteries from Powermax to GPS occurred sometime in 2013 and that GPS filed this action in September 2014. Powermax contends that the claim based on defective and expired batteries is time-barred because even if GPS had given adequate notice, it still failed to bring a claim within six months of the delivery date for the batteries. GPS asserts that this claim was governed by

the limitations period applicable to contract claims, which is longer. The Puerto Rico Supreme Court has "distinguished circumstances under which the statute of limitations for breach of contract applies from circumstances to which claims of defects apply":

> The first distinction we must consider is that existing between another thing (*ali ud* ) and defective thing. When a specific thing different from the one agreed upon is delivered, the figure of another thing or *aliud pro alio*, comes into play, which allows the buyer to bring an action for breach of contract within the corresponding period of limitation. When the very thing required is delivered, even if it is defective, the seller has complied with his obligation to furnish the thing required. What we have then is the delivery of a defective thing, and the actions available are the aedilitian actions—the redhibitory or *quanti minoris* actions—whose life is much shorter than the action for breach of contract.

*Falconer Glass*, 37 F.3d at 27–28 (quoting *Julsrud v. Peche de P.R., Inc.*, 115 P.R.R. 23, 28–29 (1983)). A "hidden defect" is defined as "that which escapes the eye of an ordinarily diligent person, the defect that is inherent to the imperfect way in which the merchandise was manufactured, packed, handled, or stored, and which renders the thing inadequate for the use for which it is destined." *Falconer Glass*, 37 F.3d at 27–28 (quoting *Julsrud*, 155 P.R.R. at 30). Applying this framework, the First Circuit held that Section 260's limitations period applied where the plaintiff ordered glass, did not claim "that defendants failed to deliver the glass," and asserted that "the glass delivered was inadequate for its intended use" because of a hidden defect. *Falconer Glass*, 37 F.3d at 28. As the *Falconer Glass* court explained, "litigants cannot circumvent a specific provision of the Puerto Rico Code by characterizing their claims generally as a 'breach of contract' in order to obtain the benefit of a longer statute of limitations period." *Id.*

As in *Falconer Glass*, GPS ordered batteries from Powermax and acknowledges that it received those batteries from Powermax. Accordingly, the limitations period prescribed by Section 260 governed GPS's claim that the batteries were expired, defective, and did not serve their intended use due to a hidden defect. This being the case, while the record indicates that in July and August 2013 GPS complained about

GPS Distributor, Inc. v. Powermax Battery (U.S.A.) Inc., Civil No. 14-1667 (JAG/BJM)                    25

Powermax-supplied batteries, it remains undisputed that GPS did not file a claim for the defective batteries within six months of the delivery date. Indeed, even assuming for the sake of argument that GPS received its last delivery from Powermax in December 2013, well over six months would have elapsed before GPS commenced this action in September 2014. Thus, GPS's claim based on the allegedly defective batteries it received from Powermax is time-barred and should be dismissed.

## CONCLUSION

For the foregoing reasons, Powermax's motion for summary judgment should be **GRANTED IN PART AND DENIED IN PART.** The court should **DISMISS WITH PREJUDICE** the Law 21 claim and the claim that GPS received defective batteries from Powermax. The court should not dismiss the remaining claims.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 8th day of August 2016.

S/Bruce J. McGiverin
BRUCE J. McGIVERIN
United States Magistrate Judge